IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JANICE BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cv-732-RAH-WC |
| | ) | (WO) |
| DAS NORTH AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.      INTRODUCTION**

Plaintiff Janice Bailey ("Bailey" or "Plaintiff") claims she suffered race and national origin discrimination and retaliation during her short, three-week employment with Defendant DAS North America, Inc. ("DAS"), an automotive parts supplier located in Montgomery, Alabama.  Bailey brings federal claims against DAS under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and a separate state law claim for negligent and wanton hiring, training and supervision.

On September 7, 2018, DAS moved for summary judgment, (Doc. 30), on all counts in the Complaint, (Doc. 1), claiming that Bailey, an African American female, was not the victim of racial or national origin discrimination or retaliation. DAS also argued that Bailey had failed to exhaust her administrative remedies for

her race discrimination claim, that she did not suffer any adverse employment actions with respect to her race and national origin, and that she was not retaliated against when she was terminated by her supervisor, also an African American female.

Bailey has filed a response, (Doc. 36), and DAS has filed a reply, (Doc. 37). For the reasons discussed below, the Court finds that summary judgment is due to be granted in favor of DAS on all claims in the Complaint.

## II.   JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1343 as to Bailey's federal causes of action. This Court has supplemental jurisdiction as to Bailey's state law claim pursuant to 28 U.S.C. § 1367. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## III.   STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under Rule 56, the Court must award summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and upon which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted).

At the summary judgment stage, the Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Factual disputes are resolved in the non-moving party's favor when there is sufficient competent evidence supporting the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Further, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S.

at 248. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the party seeking it. *See Holifield v. Reno*, 115 F.3d 1555, 1565, n. 6 (11th Cir. 1997); *Harris v. Ostrout*, 65 F.3d 912 (11th Cir. 1995).

On the other hand, if there is a conflict in the evidence, "the [plaintiff's] evidence is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000). Once the nonmoving party has responded to the motion for summary judgment, the Court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

## IV.  BACKGROUND

DAS is an automobile parts manufacturer located in Montgomery, Alabama. (Doc. 32-1, pp. 11-12.) In January 2017, Bailey, an African American female, was contacted by Tyiesha Wooten, the head of the Human Resources Division (HR) at

DAS, about an open position in HR. (Doc. 32-1, pp. 10-11.)  Like Bailey, Wooten is African American. (Doc. 32-1, p. 12.)

Bailey participated in two interviews in late January for the job, the first with Wooten and LaBrittany Hill (the employee she was replacing) on January 24, 2017. (Doc. 32-1, p. 9.)  During the interview process, Bailey was told that the position's (HR Specialist) job duties included clerical tasks and "catering" to the Korean employees of DAS. (Doc. 32-1, pp. 9-11.)  Specifically, Wooten allegedly stated that "we are here to cater to the Koreans only; to include running to Walmart, the Korean store, and for whatever they need." (Doc. 32-12, p. 4.)

Bailey later discovered that "catering" also entailed purchasing food items for a separate breakroom that Korean employees utilized, (Doc. 32-1, pp. 11, 13-14), and assisting newly-arrived employees from South Korea with securing their accommodations, (Doc. 32-1, p. 14).

Bailey also learned from Hill that "Koreans are number one" at DAS and that since Bailey was not Korean, Bailey should not "expect to get any good treatment or any special treatment or anything." (Doc. 32-1, pp. 28-29.) Hill also warned Bailey that, among other things, Wooten was "not so kind" to human resources employees. (Doc. 32-1, p. 28.)

Three days later on January 27, 2017, Bailey interviewed with Wooten again and then was hired into the HR Specialist position.  (Doc. 32-1, p. 14.)

Not long into her employment, Bailey observed several things of concern to her.  For example, Bailey was a smoker and, to access the designated smoking area at the DAS facility, she like other employees used a door in the main breakroom to enter the outside smoking area. (Doc. 32-1, p. 15.)  While a key card was not required to exit the building, a key card was required to re-enter. (Docs. 32-1, p. 15; 32-2, p. 19.)  To re-enter the building, employees without key cards had to enter through the front entrance. (Doc. 32-1, p. 15.)  Most employees, including Bailey, did not have a key card, but most managers and maintenance workers did. (Doc. 32-2, p. 19.)  Bailey claims that two non-manager Korean employees had cards. (Doc. 32-1, pp. 16, 50.) Bailey requested a key card for herself, but Wooten told her that such key cards were reserved for managers. (Doc 32-1, p. 16.)

Also, under the terms of the DAS dress code policy, employees were prohibited from wearing jeans at work. (Doc. 32-6, p. 2.)  While Bailey never wore jeans to work, she observed a Korean employee wearing jeans almost daily. (Doc. 32-1, pp. 18-19.)  Bailey never alerted any of her supervisors to the dress code violation. (Doc. 32-1, p. 19.)

But this lawsuit is not about perceived unfairness; instead, it is about Bailey's relationship with Wooten, which was problematic at the outset.  For example, at an off-site lunch during Bailey's first week on the job, Wooten remarked that "plenty of b—s want my job but they know not to f--- with me 'cause I am crazy.'" (Docs.

32-1, p. 19; 32-12, p. 4.)   Bailey thought the statement was unprofessional and concerning because she did not know to whom the statement was directed, whether to her or anyone else. (Docs. 32-1, p. 20; 32-12, p. 4.)

Wooten also required Bailey to perform menial tasks that Bailey thought Wooten could have performed herself. This included for example a demand by Wooten that Bailey come into Wooten's office, open the file cabinet, look for a folder, and read aloud a social security number contained in the folder. (Docs. 32-1, p. 24; 32-9, p. 7.)  On another occasion, Wooten told Bailey to come into her office to shred a document. (Doc. 32-9, p. 7.)

Bailey and Wooten's relationship turned sour when, during week two, Wooten tasked Bailey with making flyers for a company meeting. (Docs. 32-1, p. 20; 32-3, p. 15.)  Wooten made Bailey revise the flyers on at least two occasions because the flyers were not completed to Wooten's satisfaction.  (Docs. 32-1, pp. 20-21; 32-3, pp. 13, 15.)

Bailey's next assignment—to put together display boards for a client visit— faired no better.  Bailey asked Wooten the purpose of the display boards, to which Wooten replied, "you don't need to know all that; you just need to do what I tell you." (Doc. 32-12, p. 4.)  Wooten instructed the HR staff to complete the boards by 2:00 PM that day in time for the client's visit that afternoon. (Doc. 32-3, p. 16.) The boards were to display photographs of the employees who worked on the production

lines. HR was tasked with this assignment because HR kept the employee photographs on file. (Doc. 32-3, p. 16.)

Wooten told the HR staff they would need to work through lunch, if necessary, to complete the project. (Doc. 32-3, p. 17.)   Bailey left for lunch anyway despite Wooten's instructions. (*Id*.) According to Wooten, when she saw Bailey's display boards, the boards were completed incorrectly, contained poorly cut out photographs, omitted other photographs, and contained improperly affixed reference numbers. (Doc. 32-3, p. 18.)  Staff had to correct Bailey's errors while Bailey was out to lunch. (Docs. 32-2, pp. 18-19; 32-3, p. 18.)

Wooten texted photos of the deficient work product to Bailey and also called Bailey on the phone saying, "this is trash, you didn't put any effort into this," which to Bailey felt like she was being berated. (Doc. 32-12, p. 5.)

That Friday afternoon, following a 4:00 PM employee meeting, Wooten called Bailey into her office to discuss Bailey's work performance. (Doc. 32-1, p. 24.) Wooten criticized Bailey's work on the flyers, calling them "trashy" and "unprofessional." (*Id*.) Wooten also told Bailey that she had "no sense of urgency," and that "any time I, Tyiesha Wooten, tell you to do something, you need to jump." (Doc. 32-12, p. 5.)   In response, Bailey said the two of them should start fresh and try to get to know each other better. (*Id*.)  Wooten replied that "I don't need to get to know you. You need to get to know me. You're here to do what I tell you." (*Id*.)

8

Wooten then told Bailey to go home for the weekend and decide if she wanted to keep her job. (Docs. 32-12, p. 6; 32-1, p. 24.)

After the meeting, Bailey emailed Wooten's supervisor, James Uhm. In the email, Bailey requested a meeting because she believed Wooten intended to terminate her. (Doc. 32-10, p. 2). Uhm did not reply. (Doc. 32-1, p. 31.)

That same afternoon, after speaking with plant manager, Patrick Kurdziel, Wooten decided to terminate Bailey when she returned to work the following Monday.  (Doc. 32-3, pp. 31, 32.)

The following Monday morning, Bailey texted Uhm again in an effort to schedule a meeting. (Docs. 32-1, p. 31; 32-11, p. 2.)  This time, Uhm replied and instructed Bailey to come see him at 8:30 AM. (Doc. 32-11, p. 3.)

When Bailey sat down at her desk that morning, Wooten entered Bailey's office and kicked a box containing a Pitney Bowes postage machine. (*Id*.) Wooten then asked why the Pitney Bowes machine had not been put together.  Bailey replied that Wooten herself had told Bailey to hold off putting the machine together but that she would be happy to complete the task after her meeting with Mr. Uhm. (Doc. 32-3, p. 34.)  Wooten asked Bailey what she had been doing that morning, and Bailey explained that she had been putting together employee files. (Doc. 32-1, p 32.) According to Bailey, Wooten then snatched the files out of Bailey's hand and asked what Bailey had done to prepare the files, to which Bailey explained she was

9

checking online to make sure the files were complete. (*Id*.)  Bailey also claims that Wooten made aggressive gestures and yelled during this interaction. (Doc. 32-12, p. 7.) Eventually, Wooten "stormed" out of Bailey's office. (*Id*.)

Bailey then met with Uhm. At the meeting, Bailey explained that she felt threatened by Wooten's behavior, including that morning's recent incident. (Doc. 32-1, p. 34.) Bailey also stated that Wooten's behavior had been an ongoing problem. (*Id*.)  Bailey said she felt "singled out" by Wooten and that Wooten was creating a "hostile work environment." (*Id*.)  Bailey explained that she felt physically threatened by Wooten because of Wooten's yelling, body language (leaning over Bailey's desk while yelling at her), and kicking of the Pitney Bowes box. (*Id*.)

During the meeting, Uhm said that Wooten had been with the company since its Montgomery facility had opened and that if Bailey wanted to make accusations about Wooten, she needed to present proof such as a recording or a picture. (Doc. 32-1, p. 45.)  Uhm also said that DAS has "demanding clients" and that "sometimes we respond in an aggressive manner" because of the pressure. (Doc. 32-12, p. 8.) Bailey asked Uhm if it would be permissible to go home to give Wooten time to cool off. (Doc. 32-1, p. 34.) Uhm replied that Bailey could do whatever she wanted. (*Id*.)

Bailey returned to her office from the meeting, and five minutes later, Wooten entered with a box in her hand, telling Bailey that her services were no longer needed and that she needed to pack her things. (Doc. 32-1, p. 35.)  Bailey asked if she could

speak to Uhm about this, and Wooten replied "you are not going anywhere to tell nobody nothing. You are going out the door!" (Doc. 32-12, p. 8.)

Alesia Simmons, a co-worker, overheard the commotion and "ran out of the office for fear of what might have happened." (*Id.*)  Wooten continued her tirade, stating "you haven't done nothing all morning but you want to have a meeting," leading Bailey to believe that Wooten was angry about Bailey's meeting with Uhm. (*Id.*)  Bailey then was escorted off the property by DAS security, with Wooten yelling "thanks for three weeks of nothing." (Doc. 32-12, p. 9.)

After leaving the premises, Bailey sent a text message to Uhm, telling him that she had been terminated and that she felt this was retaliation by Wooten. (Doc. 35-5, p. 3.)  Uhm sent a reply text message stating that he did not discuss their morning meeting with Wooten. (Doc. 35-5, pp. 3-4.)

Bailey filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on July 13, 2017. (Docs. 1-1, p. 2; 32-1, p. 9.)  On the charge, Bailey checked the boxes for "retaliation" and "national origin", but she did not check the box for "race." (*Id.*)  Bailey subsequently received a right to sue letter from the EEOC, (Doc. 1-2, p. 9), and filed suit on October 25, 2017.

## IV. ANALYSIS

Bailey asserts that she suffered discrimination based on her race and national origin in violation of Title VII, race discrimination in violation of Section 1981, and

retaliation in violation of Title VII and Section 1981. Finally, Bailey asserts a state law claim for negligent hiring and retention of Wooten. DAS argues that it is due summary judgment on all claims.

## A. __Bailey Exhausted Her Administrative Remedies with the EEOC__

DAS first argues that Bailey failed to exhaust her administrative remedies concerning her race discrimination claims because she failed to check the "race" box on her EEOC charge and never used the word "race" in her summary narrative. (Docs. 1-1, p. 2; 1-2.)  DAS also points out that when it raised this issue in its summary judgment motion, Bailey failed to address the issue in her response, thereby implicitly acknowledging that summary judgment is due to be granted.

As the Eleventh Circuit has held, "the scope of a judicial complaint is defined by the scope of the EEOC investigation that 'can reasonably be expected to grow out of the charge of discrimination.'" *Baker v. Buckeye Cellulose Corp*., 856 F.2d 167, 169 (11th Cir. 1988) (quoting *Sanchez v. Standard Brands, Inc*., 431 F.2d 455, 466 (5th Cir. 1970)). The purpose of the exhaustion requirement under Title VII is to notify the defendant of the allegations and to give the EEOC "the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Green v. Elixir Ind., Inc*., 407 F.3d 1163, 1167 (11th Cir. 2005). Thus, "[n]o action alleging a violation of Title VII may be brought unless the alleged discrimination has been

made the subject of a timely-filed EEOC charge." *Thomas v. Miami Dade Public Health Trust*, 369 F. App'x 19, 22 (11th Cir. 2010) (quoting *A.M. Alexander v. Fulton County, Georgia*, 207 F.3d 1303, 1332 (11th Cir. 2000) (overruled on other grounds by *Manders v. Lee*, 338 F.3d 1304, 1328 n. 52 (11th Cir. 2003)). While the scope of an EEOC charge should be liberally construed, the proper inquiry is whether the claims in a judicial complaint are like, related to, or grow out of the allegations contained in the EEOC charge. *Gregory v. Georgia Dep't of Corrections*, 355 F.3d 1277, 1280 (11th Cir. 2004)(finding that a claim of retaliation based on race and sex discrimination is inextricably intertwined with the EEOC charge alleging race and sex discrimination).

True enough, a plaintiff cannot raise "[a]llegations of new acts of discrimination" in her judicial complaint. *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989). However, "a charging party's failure to check the appropriate box on the EEOC charge of discrimination form indicating what [s]he believes to be the basis for the discrimination (i.e. race, color, sex, disability, retaliation, national origin, age, or religion) does not bar the plaintiff from litigating a claim so long as the factual allegations in the EEOC charge are sufficient." *Houston v. Army Fleet Services LLC*, 509 F.Supp.2d 1033, 1042 (M.D. Ala. 2007) (citing *Sanchez*, 431 F.2d at 462-63) ("we decline to hold that the failure to place a check mark in the correct box is a fatal error.").

13

After due consideration, the Court declines to dismiss the race discrimination claim on this basis.  In particular, the Court finds that Bailey's race and national origin claims are inextricably intertwined, largely identical, and primarily based on Bailey's status as an African American.  *See Bullard v. OMI Ga., Inc*., 640 F.2d 632, 634 (5th Cir. 1981) ("[W]hen dealing with employment discrimination related to racial discrimination as to be indiscernible ... The line between national origin discrimination and racial discrimination is an extremely difficult one to trace").[1]

In short, while Bailey carries the burden of satisfying the exhaustion of remedies requirement and fails to address this issue in her responsive brief, the Court cannot find as a matter of law that DAS is entitled to summary judgment on exhaustion grounds.

## B. Bailey's Title VII and § 1981 Discrimination Claims

### 1. Differentiating Between Bailey's National Origin and Race Discrimination Claims

In Counts I, II, III, IV and V of her Complaint, Bailey claims that she suffered discrimination and retaliation based on her race and national origin. Bailey states that her national origin claim emanates from her "African descent", although Bailey was born in the United States and has resided in the United States her entire life.

---

[1] In *Bonner v. City of Prichard, Alabama*, the Eleventh Circuit adopted as binding all Fifth Circuit decisions prior to the close of business on September 30, 1981. 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

(Doc. 32-1, p. 13.)  It is impossible to discern from the record before the Court whether Bailey claims her termination solely was the result of discrimination based on national origin, race, or both.

"[T]he   line   between discrimination based   on   ancestry   or   ethnic characteristics, and discrimination based on place or nation of origin, is not a bright one." *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (internal citations and quotations omitted). In some contexts, "national origin' discrimination is so closely related to racial discrimination as to be indistinguishable." *Bullard*, 640 F.2d at 634 (citations and quotations omitted).  That is the case here, and therefore the Court will proceed to analyze Bailey's race and national origin discrimination claims together.

### 2. Bailey Did Not Suffer Discrimination Based Upon Her Race or National Origin

#### a. Bailey's Single Motive Discrimination Claims Fail

The Court examines Bailey's Title VII and § 1981 claims in tandem[2] because they have the same requirements of proof and use the same analytical framework.

---

[2] The Court will treat the race and national origin claims as a single claim for race.  However, the Court recognizes that discrimination on the basis of national origin is not actionable under § 1981 *See Tippie v. Spacelabs Med., Inc.*, 180 F. App'x 51, 56 (11th Cir. 2006) ("by its very terms, § 1981 applies to claims of discrimination based on race, not national origin"); *Bullard*, 640 F.2d at 634 ("The Supreme Court has stated in dicta that section 1981 relates primarily to racial claims ... and this circuit has also stated that section 1981 does not encompass discrimination based solely on national origin") (citing *Olivares v. Martin*, 555 F.2d 1192, 1196 (5th Cir. 1977)).

*See Chapter 7 Trustee v. Gate Gourmet, Inc*., 683 F.3d 1249, 1256-57 (11th Cir. 2012).

Establishing a prima facie case for race discrimination under Title VII requires showing that the employer acted with discriminatory intent. *Hill v. MARTA*, 841 F.2d 1533, 1538 (11th Cir. 1988). A plaintiff shows discrimination by presenting direct evidence of discriminatory intent in the form of actions or remarks of the employer reflecting a discriminatory attitude, or if she offers no direct evidence, the plaintiff may rely on the combination of factors set forth in *McDonnell Douglas Corp. v. Green*. *Id.* at 1539 (citing 411 U.S. 792, 802 (1973)).[3]

Direct evidence is that which reflects "a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Damon v. Fleming Supermarkets of Fla., Inc*., 196 F.3d 1354, 1358 (11th Cir. 1999). Due to the "powerful" nature of direct evidence, the Eleventh Circuit has marked severe limits for the kind of language that may be treated as direct evidence of discrimination. *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998). Only the most blatant remarks, whose intent could be nothing other than to discriminate based on a protected classification, consittute direct evidence of discrimination. *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d

---

[3] A plaintiff can also show discriminatory intent through statistical evidence. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). Bailey has offered no such evidence.

1223, 1227 (11th Cir. 2002). Evidence that is subject to more than one interpretation does not constitute direct evidence. *Taylor v. Runyon*, 175 F.3d 861, 867 (11th Cir. 1999).

Here, Bailey has not offered direct evidence of any race or national origin discrimination. At best, the statements by Wooten and Hill regarding the better treatment received by Koreans at DAS constitute circumstantial evidence of discrimination because they are not discriminatory against Bailey's own protected characteristics. *See Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001). These statements would require the factfinder to infer that Wooten eventually terminated Bailey's employment because Bailey is not Korean, and that is a far cry from the types of statements that qualify as direct evidence in this Circuit. *E.g.*, *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (a company management memorandum stating "Fire Earley [the plaintiff]—he is too old" is direct evidence of age discrimination).

The Court next examines whether Bailey has offered circumstantial evidence of discrimination. These types of claims are analyzed under the familiar *McDonnell Douglas* burden shifting framework whereby "the plaintiff must first create an inference of discrimination through [her] prima facie case." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

To establish a prima facie case of discrimination with circumstantial evidence, Bailey must show: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) either she was replaced by a person outside her protected class or a similarly situated employee outside her class was treated more favorably; and (4) she was qualified to perform her job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

DAS concedes that Bailey was a member of a protected class and that Bailey was qualified. Thus, the Court will examine the other two prongs of the *McDonnell Douglas* framework.

As to the second prong, other than her termination, Bailey fails to point to any other actionable adverse employment actions.  Instead, she makes vague reference to differential treatment between herself and unnamed Korean employees in general, such as the denial of an access key card, Korean employees' ability to wear jeans despite an express dress code prohibition, and menial task assignments from Wooten.   But those are not actionable.

A qualifying adverse employment action in the Title VII context "must in some substantial way alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

The favoritism shown toward Korean employees such as access key cards and blue jeans do not alter Bailey's compensation or terms, conditions or privileges of employment and therefore are not actionable. *See Cornell v. Brennan,* 775 F. App'x 630, 632 (11th Cir. 2019) (uniforms); *Embry v. Callahan Eye Found. Hosp*., 147 F. App'x 819, 828 (11th Cir. 2005) (eating at office, clocking in and out).

The same is true to the extent Bailey finds fault with having to run errands for Korean employees or completing menial tasks at the instruction of her supervisor, Wooten. *See McCone v. Pitney Bowes, Inc.*, 582 F. App'x 798, 799 (11th Cir. 2014) (removal of amenities such as air conditioning, restrooms, microwave oven, and a refrigerator not adverse employment actions); *White v. Hall*, 389 F. App'x 956, 960 (11th Cir. 2010) (assignment of more difficult work tasks was not adverse employment action). These aspects of employment do not constitute actionable employment actions either, especially under the undeveloped and specious facts presented by Bailey.

Moreover, it is axiomatic that Title VII "is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions." *Davis*, 245 F.3d at 1244. Bailey's complaints about key card access, the dress code, errand running and completion of menial tasks ask the Court to do just that. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).

19

This leaves Bailey's termination for discussion, which appears to be, based on her summary judgment response, the primary focus of her lawsuit. (*See* Doc. 36, pp. 17-18.)  Of course, job termination is an adverse employment action. *Crawford v. Carroll*, 529 F.3d at 970 (adverse employment actions include "ultimate employment decisions ... such as termination, failure to hire, or demotion").

Here, Bailey does not offer any evidence that she was replaced by a person of a different protected class. *See Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003). Bailey also does not offer evidence of another employee (comparator) who was treated more favorably than her.

As the Eleventh Circuit has noted, "(i)f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Wilson v. B/E Aerospace, Inc*., 376 F.3d 1079, 1092 (11th Cir. 2004) (citing *Holifield*, 115 F.3d at 1562).

While Bailey vaguely references several unidentified Korean employees that she claims were treated better than her, she does not offer any analysis of how they were similarly situated to her, or even who they are, in the context of her termination. Without more and without adequate argument, Bailey cannot raise a genuine issue of material fact that these unidentified Korean employees are similarly situated "in all material respects" to her. *Lewis v. Union City, GA*, 918 F.3d 1213, 1218 (11th

20

Cir. 2019)(*en banc*); *Wood v. Berryhill*, No. 4:18-CV-558-RDP, 2019 WL 3413785, at *6, n. 3 (N.D. Ala. July 29, 2019) ("Because Plaintiff's briefs do not present adequate argument on this issue, the court is under no obligation to consider it."). Accordingly, Bailey has failed to meet her burden of proof under *McDonnell Douglas* as it concerns her termination.

Nevertheless, establishing the elements of the *McDonnell Douglas* framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, the plaintiff will survive summary judgment if she presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. *Id*. A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker. *Id*.

Bailey's case also fails under this form of analysis, especially as it concerns her termination.  Aside from the remarks she attributes to Wooten (an African American also), Bailey offers no evidence that any other employee at DAS made discriminatory statements or engaged in discriminatory actions regarding Bailey's protected class.

Bailey states that in her meeting with James Uhm, he repeatedly mentioned that Bailey would need to provide better evidence of her mistreatment by Wooten. Bailey also offers Wooten's profane quip at an off-site lunch and Wooten's repeated criticisms of Bailey's work, often done in a loud and threatening manner. While Wooten's actions would certainly make her a nightmare of a boss, they do not make Wooten a discriminatory boss and certainly not in the context of Bailey's termination under the facts in this case.

The Eleventh Circuit has rejected similarly tenuous evidence of discrimination. *See, e.g.*, *Connelly v. Metro. Atlanta Rapid Transit Auth.*, 764 F.3d 1358, 1364–65 (11th Cir. 2014) (only evidence plaintiff presented that was "even remotely race-related" were three incidents in which supervisor called herself "a mean black b---h" and testimony that supervisor socialized with other black employees, which together were insufficient to create a reasonable inference of racial discrimination.); *Moultrie v. Georgia Dep't of Corr.*, 703 F. App'x 900, 907 (11th Cir. 2017) (plaintiff's generalized and nonspecific complaints that white employees received better treatment were insufficient to show convincing mosaic); *see also Wood v. Bailey-Harris Const. Co.,* No. 2:11-CV-136-WHA, 2012 WL 3069949, at *5 (M.D. Ala. July 27, 2012).

Bailey's evidence is similarly weak here, and thus Bailey has failed to demonstrate that DAS terminated Bailey's employment based on a prohibited discriminatory basis under the *McDonnell Douglas* analysis.

### b. Bailey's Mixed Motive Discrimination Claim Also Fails

Bailey also advocates for application of the mixed motive standard for proving discrimination based on circumstantial evidence, it appears that Bailey somewhat mixes the single motive and mixed motive analysis. (Doc. 36, p. 17.) But to be fair, Bailey's Complaint takes no position as to whether she is advancing a single-motive or mixed-motive discrimination claim either. Therefore, the Court will assume that Bailey has asserted both and will examine the merits in turn. *See Williams v. Fla. Atl. Univ.*, 728 F. App'x 996, 999 (11th Cir. 2018).

The Court first notes that the Supreme Court recently held that a mixed-motive or motivating factor theory does not apply to § 1981 claims. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009 (2020). In *Comcast Corp.*, the Supreme Court concluded that "(t)o prevail [on a Section 1981 claim], a plaintiff must initially plead and ultimately prove that, *but for* race, it would not have suffered the loss of a legally protected right." *Id.* (emphasis added). Therefore, this Court conducts its mixed-motive analysis solely in regard to Bailey's Title VII claim.

"[A]n adverse employment action motivated by both legal and illegal reasons constitutes actionable discrimination under Title VII." *Quigg v. Thomas Cty. Sch.*

23

*Dist.*, 814 F.3d 1227, 1236 (11th Cir. 2016) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)). A plaintiff "can succeed on a mixed-motive claim by showing that illegal bias," such as bias based on race or national origin, "was a motivating factor for an adverse employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e–2(m)). A plaintiff "can prove a mixed-motive case with direct or circumstantial evidence." *Id.* at 1237 (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003)).

Courts do not apply the *McDonnell Douglas* framework to evaluate a mixed-motive claim at the summary judgment stage. *Quigg*, 814 F.3d at 1238. Rather, "[t]o avoid summary judgment, a plaintiff raising a mixed-motive claim must offer evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [her]; and (2) a protected characteristic was a motivating factor for the [employer]'s adverse employment action." *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1364 (11th Cir. 2018) (quoting *Quigg*, 814 F.3d at 1239) (internal quotation marks omitted). "In other words, the court must determine whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision." *Quigg*, 814 F.3d at 1239 (internal quotation marks omitted) (bracketed text in original).

24

To begin, as previously stated, job termination is obviously an adverse employment action. The Court therefore must examine whether race or national origin were motivating factors for Bailey's termination.

Based on the record, Bailey's proffered evidence fails to create a genuine issue of material fact that DAS actually relied on Bailey's race or national origin terminating Bailey. *See Quigg*, 814 F.3d at 1241. Bailey has alleged that Wooten (the decisionmaker) made statements suggestive of impermissible bias. According to Bailey, Wooten told her that the job of the HR employees was to "cater" to Korean employees. (Doc. 32-12, p. 4.) Bailey does not otherwise assert that Wooten made any statement that her termination occurred because she was not Korean, let alone that she was being terminated *because of* one of Bailey's protected characteristics. The question is whether the Korean favoritism comment during her interview process several weeks before her termination provides enough circumstantial evidence to get Bailey past summary judgment. *See Quigg*, 814 F.3d at 1239. It does not.

As the Court already explained, none of the circumstantial evidence Bailey has presented shows that Wooten's decision to terminate Bailey was due to discriminatory bias. *See Martin v. Shelby Cty. Bd. of Educ.*, 756 F. App'x 920, 924 (11th Cir. 2018); *Quigg*, 814 F.3d at 1239. This is especially true when Wooten was an African American female, like Bailey. Bailey simply did not present any facts or

evidence to indicate that her race or national origin impacted Wooten's decision to terminate her employment. Wooten's comments about catering to the Koreans are much more akin to "stray remarks at the workplace." *See Price Waterhouse*, 490 U.S. at 251; *Quigg*, 814 F.3d at 1242.

Wooten may have been uncivil, unpleasant, unprofessional and a horrible boss, but that does not make her a discriminatory one. *E.g., Barnette v. Fed. Exp. Corp.*, 491 F.App'x 176, 183 (11th Cir. 2012) ("Although the record may demonstrate that [the plaintiff's supervisor] was offensive and had conducted himself inappropriately, or could be an unpleasant supervisor, there is little to show that gender discrimination motivated the termination of [the plaintiff]"); *Hudson v. Norfolk S. Ry. Co.*, 209 F.Supp.2d 1301, 1316 n.19 (N.D. Ga. 2001) ("Title VII, however, certainly does not prohibit all behavior an employee may find to be unpleasant or annoying.").

As a result, Bailey has failed to provide sufficient evidence for a reasonable jury to find that her race or national origin were a factor in her termination. *See Quigg*, at 1239.

### 3.   Bailey Was Not Subject to a Discriminatory Hostile Work Environment

Because Bailey used the words "hostile work environment" in her meeting with Uhm and alleges in her Complaint that she was "harassed" based upon her race

and national origin, (Docs. 1, pp. 6-7; 32-1, p. 34), Bailey apparently asserts that she has raised a hostile work environment claim.

DAS claims that, under Fed. R. Civ. P. 8(a)(2), Bailey has failed to give DAS fair notice that she was making such a claim in her Complaint. (Doc. 31, p. 29.) *See Fikes v. City of Daphne*, 79 F.3d 1079, 1082 (11th Cir. 1996) (the pleader must present his claims "discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not.") (citing *T.D.S. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1543 n. 14 (11th Cir. 1985) (Tjoflat, J., dissenting); *cf. Nurse v. City of Alpharetta*, 775 F. App'x 603, 607 (11th Cir. 2019)).

To be sure, Bailey's Complaint contains six counts, none of which assert a claim for a hostile work environment.  Bailey could have asserted such a claim and done so in a separate count so that DAS could discern what she is claiming, and thereby frame a responsive pleading. *E.g., Palmer v. Albertson's LLC*, 418 F. App'x 885, 889 (11th Cir. 2011). She did not, and accordingly DAS is entitled to summary judgment to the extent Bailey is attempting to advance a hostile work environment claim in this case. *See Palmer*, 418 F. App'x at 889; *Cheney v. Fulton Cty., Georgia*, No. 1:14-cv-02009-ELR, 2016 WL 8315429, at *1 (N.D. Ga. Sept. 6, 2016).

27

Nevertheless, even if Bailey had properly asserted such a claim in her Complaint, DAS is still due summary judgment.   To plead a hostile work environment claim, a plaintiff must allege that (1) she belongs to a protected class, (2) she has been subjected to unwelcomed harassment, (3) the harassment was based on a protected characteristic of the employee, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment, and (5) the employer is liable for the harassment. *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002). "A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller*, 277 F.3d at 1275 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21. A court must consider the following factors in evaluating whether conduct is severe or pervasive enough to create an objectively hostile or abusive work environment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive

utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276. Courts must employ common sense and carefully consider social context when determining whether a plaintiff has alleged facts that a jury could reasonably find created an objectively hostile or abusive work environment. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998).

The conduct that Bailey complains of here does not trigger Title VII's scrutiny by a long shot. The Eleventh Circuit has examined and rejected hostile environment claims with far worse allegations.   *See McCann v. Tillman,* 526 F.3d 1370 (11th Cir. 2008) (white supervisor using racist language about employee did not create hostile work environment); *Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57–58 (11th Cir. 2005) (presence of racist symbols and use of racial slur by supervisor did not constitute hostile work environment); *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (supervisor's remarks that plaintiff was a "dumb s--t," "stupid f--k," and "dumb f--k," fell "under the rubric of general vulgarity that Title VII does not regulate."); *McCann v. Tillman*, 526 F.3d 1370, 1378-79 (11th Cir. 2008) (three racially demeaning comments, two made in plaintiff's presence and one she heard about, insufficient to show hostile work environment); *compare Miller*, 277 F.3d at 1276 (supervisor's ethnic slurs about employee were so frequent so as to permeate the workplace, thus demonstrating hostile work environment).

Indeed, Bailey does not cite to a single slur or derogatory comment that, in the most liberal of inferences, suggests that Wooten created a hostile work environment based on Bailey's race or national origin.   Wooten's comment regarding how Koreans were favored at DAS was not a derogatory statement about Bailey's race or national origin. The conduct Bailey complains about – Wooten's frequent criticisms of Bailey's work, Wooten's threatening manner, or use of curse words at an off-site lunch – fall far short of creating an environment that "permeates" the workplace with bigotry about Bailey's race or national origin. *See Miller*, 277 F.3d at 1276.   In fact, the work environment at issue largely involved only two individuals – Wooten and Bailey – both of whom were African American females. Simply put, Bailey has presented virtually no evidence of a work environment permeated with racism or discriminatory animus to support a hostile work environment.

Therefore, the Court will GRANT summary judgment to DAS on Counts I, III and IV of Bailey's Complaint.

### C. Bailey's Title VII and § 1981 Retaliation Claims

Retaliation against an employee who engages in statutorily protected activity is prohibited under both Title VII and § 1981. *See* 42 U.S.C. § 2000e–3(a); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (concluding that § 1981 encompasses retaliation claims); *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d

1249, 1257–58 (11th Cir. 2012). Claims for retaliation under both of these statutes, as in substantive discrimination cases, proceed under the same prima facie framework. *E.g., Chapter 7 Tr.*, 683 F.3d at 1258; *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181, n. 6 (11th Cir. 2010); *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). A plaintiff demonstrates a prima facie case of retaliation by showing that (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. *Crawford v. Carroll*, 529 F.3d at 970. Once the plaintiff meets this burden, the employer has an opportunity to articulate a legitimate non-retaliatory reason for its employment action, which the plaintiff can rebut with evidence of pretext. *Brown*, 597 F.3d at 1181–82.

DAS does not dispute that Bailey was subject to an adverse employment action (her termination). DAS instead argues that Bailey has failed to establish that she engaged in protected conduct, and even if she did, that she has failed to make any causal connection between her termination and her engaging in protected conduct. The Court will examine DAS's arguments in that order.

### 1.  Bailey Did Not Engage in Protected Conduct

DAS first argues that Bailey did not engage in protected conduct when Bailey met with Mr. Uhm shortly before her termination.  In particular, DAS notes that Bailey did not tell Uhm that Wooten was discriminating against her due to her race

or national origin, but rather, they only discussed generalized management-style grievances about Wooten. The record proves this to be the case.

Informal complaints to an employee's superiors and the use of an employer's internal grievance procedures can qualify as protected conduct. *See Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). "A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." EEOC Compl. Man. (CCH) §§ 8–II–B(2) (2006); *see Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009) (using the EEOC manual in interpreting the opposition clause of the antiretaliation statute); *see also Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010).

While Bailey made complaints regarding Wooten's behavior, there is no evidence in the record that during Bailey's meeting with Uhm she accused Wooten of unlawful employment discrimination. *See Brandon v. GlaxoSmithKline, LLC*, No. 7:15-CV-01804-RDP, 2017 WL 2876184, at *17 (N.D. Ala. July 6, 2017) (citing *Murphy*, 383 F. App'x at 918). The evidence presented by Bailey simply shows that Bailey approached Uhm the Friday and Monday morning before her termination on the belief that she was about to be fired by Wooten because of their confrontation.

32

To be classified as a statutorily protected activity, "the employee must still, at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred." *Demers v. Adams Homes, Inc*., 321 F. App'x 847, 852 (11th Cir. 2009) (internal quotes omitted); *see Jeronimus v. Polk County Opportunity Council, Inc*., 145 F. App'x 319, 326 (11th Cir. 2005) (a complaint "of being 'singled out,' being subjected to 'a campaign of harassment,' and working in a 'hostile environment' ... did not amount to protected conduct" where it "never suggested that this treatment was in any way related to [the plaintiff's] race or sex"). Most plainly, "[a] complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." *Murphy*, 383 F. Appx 915, 918 (11th Cir. 2010) (internal quotes omitted). Simply complaining that one feels "picked on" will not suffice. *Gosa v. Wal-Mart Stores E., LP*, No. CV 16-0055-CG-B, 2017 WL 457198, at *12 (S.D. Ala. Feb. 2, 2017) (citing *Sitar v. Ind. Dep't of Tranps*., 344 F.3d 720, 727 (7th Cir. 2003)). Yet, that is essentially what Bailey did here.

Bailey's arguments to the contrary are unavailing. Just because Bailey invoked the phrase "hostile work environment" during her meeting with Uhm, did not put Uhm on notice that Bailey was complaining about unlawful discrimination. Bailey admits as much in her discovery responses when she stated that her

33

complaints about Wooten were merely about Wooten's management style and unprofessional conduct. (Doc. 32-9, pp. 8-9.)   These complaints to Uhm were insufficient to trigger Title VII's protections against retaliation.

But even assuming that Bailey's use of the phrase "hostile work environment" in her discussion with Uhm is sufficient, Bailey must still show that her complaint to Uhm about Wooten's conduct was based on a "good faith reasonable belief" that Wooten was engaged in unlawful discrimination. *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). Bailey must show that she subjectively believed that DAS engaged in unlawful discrimination and that her belief was objectively reasonable in light of the facts and record present. *See Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010); *Binion v. PNC Bank, Nat'l Ass'n*, No. 7:14-CV-1140-TMP, 2017 WL 992179, at *13 (N.D. Ala. Mar. 15, 2017).

"The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *Clover*, 176 F.3d at 1351 (citing *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 n. 2 (11th Cir. 1998) (failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry")).

Even if Bailey had a subjective belief that Wooten, as an African American, was harassing and discriminating against her on the basis of Bailey's race or national

origin as an individual of African decent, this belief was not objectively reasonable in light of the facts presented in the record. *See Brown v. City of Opelika*, 211 F. App'x 862, 864 (11th Cir. 2006). Granted, an employer's "intent may be difficult to discern," *Reeves*, 594 F.3d at 813, but "it is not objectively reasonable to presume that, simply because an employee has been subjected to seemingly inexplicable negative treatment, the true reason for the treatment must be unlawful discrimination. In other words, it is not objectively reasonable to infer race or gender discrimination merely from the lack of a clear reason for an employer's mistreatment of its employee," *Herron-Williams v. Alabama State Univ.*, No. 18-10875, 2020 WL 599301, at *8 (11th Cir. Feb. 7, 2020). As discussed *supra*, the allegations described in Bailey's communications to Uhm about Wooten are not nearly close enough to unlawful discrimination to permit Bailey to draw such an inference as an objective matter. *See Herron-Williams*, 2020 WL 599301, at *8.

### 2.    Bailey Has Failed to Show a Causal Connection Regarding Her Meeting with Uhm and Her Termination

Even if the Court was to assume that Bailey engaged in protected conduct, she still has failed to demonstrate a causal connection between her meeting with Uhm and her termination minutes later by Wooten.

A plaintiff making a retaliation claim under § 2000e-3(a) and § 1981 must establish that her protected activity was a "but-for" cause of the alleged adverse action by the employer. *E.g.*, *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338,

35

362 (2013); *Brown v. CRST Malone, Inc*., No. CV-12-BE-3954-S, 2014 WL 4681363, at *18-19 (N.D. Ala. Sept. 17, 2014). In other words, to survive summary judgment here, there must be a genuine dispute that, but for Bailey's meeting with Uhm, Wooten would not have terminated Bailey. *Herron-Williams*, 2020 WL 599301, at *9.

To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse act were at least somewhat related and in close temporal proximity. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). Where, as here, the plaintiff is attempting to prove retaliation through circumstantial evidence, close temporal proximity between the protected activity and the adverse employment action may be sufficient to prove the two events were not "wholly unrelated." *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). Temporal proximity must be "very close." *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (internal quotation marks omitted).

Here, Bailey's meeting with Uhm and her subsequent termination occurred within a matter of minutes, so ostensibly there is no question that these events are "very close" in temporal proximity. However, as the Eleventh Circuit has explained, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have

36

Case 2:17-cv-00732-RAH-WC   Document 41   Filed 07/17/20   Page 37 of 39

knowledge that the employee engaged in protected conduct." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (citing *Clover*, 176 F.3d at 1355-56). As the *Brungart* court explained,

> In *Clover* the plaintiff, who brought a Title VII retaliation claim, had been informed the day after she engaged in protected conduct that she was going to be terminated, and later she was terminated. Notwithstanding the close temporal proximity between the protected conduct and the initial decision to terminate the plaintiff, we reversed the district court's denial of the defendant's motion for judgment as a matter of law on the retaliation claim. We did so because the plaintiff "failed to present sufficient evidence to establish that [the decision maker] was aware of her protected conduct." Exactly the same situation is before us in this case, and the *Clover* decision compels the same result.

*Id*.

Indeed, the same situation is before this Court as well.  Even if, construing the facts in favor of Bailey, Wooten was aware that Bailey was having *a meeting* with Uhm, there is no evidence that shows Wooten was aware that Bailey was having a meeting to complain about Wooten's allegedly discriminatory behavior. *See Clover*, 176 F.3d at 1354-1355. Moreover, the discussion with Uhm came the Monday after Wooten already had made the decision to terminate Bailey and after Bailey herself believed her termination was imminent.   "A jury finding that [Wooten] was aware of [Bailey's] protected conduct must be supported by reasonable inferences from the evidence, not mere speculation." *Id*. The Court will not engage in such speculation either.

37

Therefore, because Bailey has failed to demonstrate a causal connection between her meeting with Uhm and her termination, summary judgment is due to be GRANTED as to Counts II and V of Bailey's Complaint.

### D. **Bailey's State Law Claim Also Fails**

Finally, in Count VI, Bailey asserts a state law claim of negligent and wanton hiring, training, retention and supervision.

Under Alabama law, the tort of negligent or wanton hiring, training, supervision, and retention requires a plaintiff to show an employer knew or should have known its employee was incompetent. *See Buckentin v. SunTrust Mortg. Corp.*, 928 F. Supp. 2d 1273, 1288 (N.D. Ala. 2013) (discussing negligent and wanton hiring, supervision, and retention); *Armstrong Bus. Servs. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001) (discussing negligent supervision); *Brown v. Vanity Fair Mills, Inc*., 277 So. 2d 893, 895 (1973) (discussing negligent hiring, retention, and entrustment).

The tort also is predicated on "underlying tortious conduct of an employee." *Stevenson v. Precision Standard, Inc*., 762 So. 2d 820, 824 (Ala. 1999) ("That cause of action, however, [is] predicated on the underlying tortious conduct of an employee."). But Alabama does not recognize a common-law tort for race discrimination or retaliation. *See Thomas v. Util. Trailer Mfg. Co.,* No. 1:05-CV-914-MEF, 2006 WL 2480057, at *3 (M.D. Ala. Aug. 28, 2006). There also is no

reported Alabama case recognizing a common-law tort for national origin discrimination or retaliation.

And to the point, federal courts do not graft federal causes of action onto a state law claim. *See Guy v. Alabama Power Co.*, No. 2:13-CV-8-MHT, 2013 WL 3929858, at *3 (M.D. Ala. July 29, 2013); *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) (finding that because Alabama does not recognize a gender discrimination tort claim, plaintiff cannot maintain an action for negligent supervision, training, and/or retention based upon conduct that is employment discrimination).

Because Bailey has not shown an underlying Alabama common-law tort as a part of her negligent and wanton hiring, training and supervision claim, DAS is due summary judgment on Count VI.

## V. CONCLUSION

For the foregoing reasons, it be and is hereby

ORDERED that the Defendant's Motion for Summary Judgment, (Doc. 30), is GRANTED this case is DISMISSED with prejudice.

A separate judgment shall issue.

DONE, this 17th day of July, 2020.

/s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE